UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


KAREN FIMBRES, Administratrix of
the Estate of Thomas Alton Basham, et al.                    PLAINTIFF


v.                                                    NO. 3:11-CV-226-CRS-JDM


GARLOCK EQUIPMENT CO.                                        DEFENDANT


## MEMORANDUM OPINION

This matter is before the court on the motion of Defendant Garlock Equipment Co. ("Garlock") for summary judgment. (DN 63). Plaintiff Karen Fimbres, as administratrix of the Estate of Thomas Alton Basham ("Plaintiff"), has filed a response to Garlock's motion (DN 68), to which Garlock has replied (DN 69). Fully briefed, the matter is now ripe for adjudication. For the reasons stated herein, Garlock's motion for summary judgment (DN 63) will be granted.

## I.

The following facts are undisputed.[1] Plaintiff represents the estate of her adult son, Thomas Alton Basham ("Basham"), who allegedly sustained job-related injuries when the Genesis 412 asphalt kettle that he was operating "exploded" and covered his body with hot asphalt. As a result of the explosion, Basham suffered thermal injuries over a significant percentage of his body. At the time of the April 13, 2010 incident, Basham was employed as a

---

[1] In her responsive brief, Plaintiff states that she "does not take issue with many" of the material facts as stated in Garlock's Memorandum of Law in Support of its Motion for Summary Judgment, with the exception of certain characterizations of Plaintiff's expert witness. (DN 68). As such, we will accept as true the factual assertions contained in Garlock's Memorandum of Law. (DN 63-1).

roofer by Bruce's Tri–State Roofing & Sheet Metal Co. ("Bruce's Tri–State").[2]  Basham subsequently died from a pain medication overdose on March 24, 2011.[3]

On the day of the incident, Bruce's Tri–State was performing roofing work at Lebanon Junction Elementary School in Bullitt County, Kentucky.  Basham was tasked with operating an asphalt kettle manufactured and distributed by Garlock.  Testimony from Basham's coworkers indicates that this was the first time Basham had operated a kettle "from dead cold to" application temperature.  (DN 63-8, p. 5).  An asphalt kettle is used in the asphalt roofing industry to heat solid blocks of asphalt and pump the melted asphalt to a rooftop through the "hot line" pipe.[4]  The asphalt is then used to insulate the roof from water penetration.  An asphalt kettle operator is charged with monitoring the kettle's temperature and adjusting the flow of propane to the kettle's burners to maintain the asphalt at a level below its flashpoint temperature and at or above its application temperature.  This monitoring can be done by the use of a hand-held thermometer or sensor or a tank-mounted gauge.

The particular asphalt kettle Basham was operating on the day of the incident came equipped with an Automatic Temperature Control Sensor ("ATECS").  The device continuously monitors the temperature of the asphalt in the kettle and automatically shuts off or turns on the propane burners to maintain the asphalt temperature at or below the level set by the operator.  Thus, it obviates the need for the kettle operator to manually monitor the temperature of the

---

[2]  Bruce's Tri–State was originally named as a defendant in this action.  We dismissed the claims against Bruce's Tri–State on August 25, 2011 after determining that they were barred by the exclusivity provision of the Kentucky Workers' Compensation Act, KRS § 342.690.  (DN 23).
[3]  Basham was originally named as the plaintiff when this action was filed but, after his death, the complaint was amended and Plaintiff was substituted as the representative of Basham's estate.
[4]  Roofers can use a variety of asphalt types, each of which has varying application, flashpoint, and auto-ignition temperatures.  The application temperature is the temperature at which the asphalt is pumped to the rooftop.  From there, the asphalt is "mopped" onto felt boards that are layered on the roof and covered with rock.  The application temperature is established by the asphalt manufacturer and listed on each asphalt keg.  The flashpoint is the temperature at which the vapors emitted from melted asphalt will ignite if exposed to an ignition source.  Finally, the auto-ignition temperature is the temperature at which asphalt will combust and burn without an external ignition source.  Most asphalt variants have an auto-ignition temperature of 650 degrees.

asphalt. However, the ATECS device was not connected to the kettle on the day of the incident: a supervisor at Bruce's Tri–State had disconnected the device more than a year before the incident due to an alleged malfunction. Thus, the kettle was essentially operating in a manual mode because its self-regulating controls were disabled. The Operator's Instruction Manual contemplates that the kettle can be operated without the assistance of the ATECS device, as it provides specific instructions on "temporarily bypass[ing]" the ATECS controls in the event that "problems develop" with the system. (DN 63-3, p. 16). The manual further instructs users to "[m]onitor the kettle temperature closely to avoid overheating problems" in the event that the ATECS device is bypassed. (*Id.*).

Plaintiff argues that Basham's injuries resulted from the improper bypassing of the ATECS system which in turn allowed the asphalt in the kettle to overheat past its flash point and flash out of the kettle. Plaintiff has asserted various causes of action against Garlock, including: (1) negligence/wrongful death (Count I); (2) strict liability (Count II); (3) failure to warn (Count III); and (4) breach of warranty (Count IV). Each claim is predicated on Plaintiff's theory that Garlock defectively designed the asphalt kettle and failed to warn Basham of its associated dangers.

## II.

A court may grant a motion for summary judgment if it finds that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and of identifying the portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Failure to prove an essential element of a claim renders all other facts immaterial. *Elvis Presley Enters, Inc. v.*

*Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). Once the moving party satisfies this burden, the nonmoving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Summary judgment is proper if the nonmoving party cannot meet her burden of proof after sufficient opportunity for discovery. *Celotex*, 477 U.S. at 322–23.

The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir. 1962). However, the nonmoving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party cannot rely upon the assertions in its pleadings; rather, that party must come forward with probative evidence, such as sworn affidavits, to support its claims. *Celotex*, 477 U.S. at 324. It must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

## III.

Though not explicitly stated in their briefs, the parties appear to agree that the substantive law of Kentucky governs this diversity action. *See Rutherford v. Columbia Gas*, 575 F.3d 616, 623 (6th Cir. 2009). In Kentucky, a party injured by a product can bring suit for that injury under three different theories: (1) strict liability in tort; (2) negligence; or (3) breach of warranty

under the Uniform Commercial Code.  *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 535 (Ky. 2003).  Plaintiff has asserted claims under all three theories.

## A.

First, Plaintiff brings design defect claims[5] sounding in both negligence and strict liability.  The Supreme Court of Kentucky has specifically addressed the standard required for such claims:

> A plaintiff in Kentucky can bring a defective design claim under either a theory of negligence or strict liability.  The foundation of both theories is that the product is "unreasonably dangerous."  *Ulrich v. Kasco Abrasives Co., Ky.*, 532 S.W.2d 197, 200 (1976).  Whereas negligence examines the conduct of the manufacturer—could the manufacturer foresee the harm to the plaintiff and did the manufacturer act reasonably to prevent that harm—strict liability typically evaluates the condition of the product.  But in a negligent design case, even a strict liability claim examines the manufacturer's conduct.  *See Nichols v. Union Underwear Co. Inc., Ky.*, 602 S.W.2d 429 (1980) (distinction between strict liability and negligence "is of no practical significance so far as the standard of conduct required of the defendant").  So under either theory, it is the legal duty of a manufacturer to use reasonable care to protect against foreseeable dangers.

*Id.*

In design defect cases, a product is considered "defective" if "it is made according to an unreasonably dangerous design."  *Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 69 (Ky. 1973).  A plaintiff has the burden of showing an identifiable, unreasonably dangerous defect, and must show that the defect "probably caused the accident."  *See Gray v. Gen. Motors Corp.*, 133 F. Supp. 2d 530, 533 (E.D. Ky. 2001), *aff'd*, 312 F.3d 240 (6th Cir. 2002) (citation omitted).  The relevant inquiry is "whether the product creates 'such a risk' of an accident of the general nature of the one in question 'that an ordinarily prudent company engaged in the manufacture' of such a product 'would not have put it on the market.'"  *Montgomery Elevator Co. v. McCullough*, 676

---

[5]  Plaintiff does not argue that the kettle suffered from a manufacturing defect.  Such an argument would be fatal since her expert, Andrew Tudor, concluded that there was no evidence of a manufacturing defect.

S.W.2d 776, 780 (Ky. 1984) (quoting *Nichols v. Union Underwear Co., Inc.*, 602 S.W.2d 429, 433 (Ky. 1980)). "[I]n Kentucky, in order to prove a product is 'unreasonably dangerous' as designed, a plaintiff is required to produce competent evidence 'of a feasible alternative design' that would have prevented the injury." *Cummins v. BIC USA, Inc.*, 835 F. Supp. 2d 322, 326 (W.D. Ky. 2011) (quoting *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 42 (Ky. 2004)).

The Kentucky Supreme Court has held that expert testimony is generally needed "for a proper understanding of that which requires scientific or specialized knowledge and which cannot be determined intelligently from testimony on the basis of ordinary knowledge gained in the ordinary affairs of life[.]" *Commonwealth v. Robbins*, 421 S.W.2d 820, 824 (Ky. 1967). Moreover, "expert witnesses are generally necessary, indeed essential, in products liability cases . . . to prove such matters as a product defect and proximate causation[.]" *Thomas v. Manchester Tank & Equip. Corp.*, 2005 WL 3673118, *1 (W.D. Ky. May 13, 2005) (quoting WILLIAM S. HAYNES, KENTUCKY JURISPRUDENCE: TORTS § 21–18 (1987)); *see also Stevens v. Keller Ladders*, 1 F. App'x 452, 458 (6th Cir. 2001).

In the instant action, Plaintiff asserts that the kettle was defectively designed because it allowed for the ATECS system to be bypassed. Thus, expert testimony is needed to determine whether the kettle was, in fact, defectively designed because this is not a matter within the general knowledge of ordinary persons. *See Manchester Tank*, 2005 WL 3673118, at *1. Plaintiff argues that the testimony of her proposed expert, Andrew Tudor, will provide sufficient evidence from which a jury could find that the asphalt kettle was defectively designed.

Garlock, however, argues that Tudor's testimony should be excluded because it does not meet the standard for admissibility required under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Garlock maintains that if Tudor's testimony is excluded, Plaintiff cannot prove

the existence of a product defect because under Kentucky law, "[p]roof of nothing more than that a particular injury would not have occurred had the product which caused the injury been designed differently is not sufficient to establish a breach of the manufacturer's or seller's duty as to the design of the product." *Jones*, 502 S.W.2d at 70–71 (quoting 63 AM. JUR. 2D PRODUCTS LIABILITY § 73, p. 79); *Bush v. Michelin Tire Corp.*, 963 F. Supp. 1436, 1441 (W.D. Ky. 1996) ("[T]o establish a defect in product design, a plaintiff must show something more than that it was theoretically probable that a different design would have been feasible") (internal marks and citation omitted).

Thus, we must address whether Tudor's testimony is admissible, an inquiry that is governed by Federal Rule of Evidence 702.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, the trial judge acts as a gatekeeper to ensure that expert testimony is both relevant and reliable.  *Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 533 (6th Cir. 2010) (citing *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007)); *see Daubert*, 509 U.S. at 589.  This gatekeeping role is not limited to expert testimony based upon scientific knowledge; it instead, extends to "all 'scientific,' 'technical,' or 'other specialized' matters within" the scope of Rule 702.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–48 (1999).  In determining whether certain testimony is reliable, the trial judge must

assess "whether the reasoning or methodology underlying the testimony is scientifically valid and [ ] whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

The Sixth Circuit has outlined a number of "[r]ed flags that caution against certifying an expert." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). These include "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Id.* (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). Where the testimony of a proffered expert is challenged for insufficient "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [his or her] discipline.'" *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). Generally, a trial judge has considerable leeway in deciding whether particular expert testimony is reliable. *Id.* at 152; *accord Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002).

In seeking to exclude Tudor's testimony, Garlock specifically attacks his qualifications, as well as the general soundness and reliability of his opinions. Plaintiff's responsive brief does not address the charges made against her expert. Rather, Plaintiff only states that "the portion of Defendant's brief regarding Andrew Tudor appears to be nothing more than counsel's opinion and argument regarding Mr. Tudor's qualifications, and not facts at all." (DN 68, p. 2). Plaintiff does not counter Garlock's numerous assertions regarding Tudor's allegedly unreliable testimony, nor does she attempt to bolster Tudor's credibility or qualifications. Having failed to produce evidence necessary to rebut Garlock's arguments, Plaintiff does not raise a material factual dispute as to the admissibility of her expert's testimony. Thus, we will exclude Tudor's testimony on these grounds.

Even had Plaintiff responded to Garlock's arguments regarding Tudor's testimony, we would otherwise be compelled to exclude the testimony under *Daubert* as it raises a number of the red flags identified by the Sixth Circuit, including lack of testing. *See Newell Rubbermaid, Inc.*, 676 F.3d at 527 (citations omitted). Moreover, as explained below, we find that Tudor is not qualified to give expert testimony on the design of the asphalt kettle, and that his testimony is both unreliable and would not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

Rule 702 requires that an expert have "specialized knowledge" with regard to the area about which he will testify. Although the Sixth Circuit interprets this requirement liberally, a witness will not be designated as "an expert simply because he claims to be." *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (quoting *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 855 (3d Cir. 1990)). According to his curriculum vitae, Tudor holds a Bachelor of Science and a Master of Science in mechanical engineering from the University of Illinois. (DN 63-13, p. 2). Since October 1997, Tudor has provided consultations in the areas of mechanical engineering analysis, design, and safety. (*Id.*). He considers mechanical safety as his area of expertise, specifically machine design and materials, but admits that he has never operated or designed any component of an asphalt kettle. (DN 63-5, p. 75).

Although Tudor worked as a roofer for one week in high school, he has never operated an asphalt kettle and has only seen them in operation "in passing." (*Id.* p. 51). He testified that he does not have "much" experience with roofing asphalt, he does not have an opinion as to what caused the asphalt vapors to ignite in the instant action, he has never designed an asphalt kettle, and he does not know what is considered "state of the art" in the commercial hot asphalt roofing industry. (*Id.* p. 76, 108–09, 238–39). At his deposition, Tudor conceded that he had not done

any testing or analysis on asphalt kettles.  (*Id.*).  All of his opinions regarding asphalt kettles of any kind were formed in connection with the litigation.[6]  Therefore, we find that although Tudor is trained in engineering, he is not specifically qualified under *Daubert* to testify on the issue of design defect as related to asphalt kettles.

Plaintiff has also failed to show that Tudor's testimony would be reliable or relevant.  To be considered "reliable" under *Daubert*, an expert's testimony must be grounded in sustainable methods and procedures; it should be more than a subjective belief or an unsupported speculation.  *Daubert*, 509 U.S. at 590.  "Relevance" relates to the "fit" of the testimony, that is, "whether [the] reasoning or methodology properly can be applied to the facts in issue[,]" so as to assist the trier of fact.  *Daubert*, 509 U.S. at 593.

In this case, expert testimony is required on the issues of whether the kettle was defective and if there is a causal connection between that defect and plaintiff's injury.  Tudor's expert testimony regarding the asphalt kettle in question derives solely from one inspection of the kettle.  In preparing his opinions, Tudor chose not to collect technical data from other asphalt

---

[6]   At his deposition, Tudor testified as follows:

> Q:    . . . . [A]t any point in your career have you done any testing on an asphalt kettle?
>
> A:    No, sir, I don't believe so.
>
> Q:    And at any time in your career have you ever worked on an asphalt kettle?
>
> A:    I don't believe so.
>
> Q:    And in preparation for your issuance of this report, the sole time you looked at an asphalt kettle was your inspection in Kentucky.
>
> A:    That's correct.
>
> . . .
>
> Q:    What is your experience with roofing asphalt?
>
> A:    Not much.

(DN 63-5, p. 75–76).

kettle manufacturers. Rather, he gleaned from one conversation with an employee of a Texas company who refurbishes used asphalt kettles that in the industry, asphalt kettles are generally "run by temperature gauges and they do not have any safety system [such as ATECS] on them." (*Id.* at p. 69–70; 73). Tudor further testified that this is how kettles in the industry have been manufactured for the past fifty years.[7] (*Id.*).

Yet from this limited basis of knowledge, Tudor opines that the asphalt kettle designed by Garlock was defective because it specifically provided for a procedure to run the kettle with the ATECS unit—or what he calls the "safety feature"—disabled. However, when the ATECS system is bypassed the kettle is essentially operating in "manual" mode—the way in which these kettles have historically been operated and continue to be operated in the industry. Thus, Tudor does not identify how Garlock's kettles differed in design from other asphalt kettles on the market.

Tudor also opines that the kettle was defective because its externally mounted temperature gauge could only be viewed by the operator when he was standing on one side of the kettle. Tudor opines that the kettle should have been equipped with two externally mounted temperature gauges in the event that one of the gauges provided an erroneous reading. Yet there is no such claim that the temperature gauge on the unit in question was improperly calibrated so as to mislead Basham as to the kettle's internal temperature. Although Tudor believed that the gauge might have been improperly calibrated, he did not conduct any tests to determine the gauge's accuracy. (DN 63-5, p. 38‑39). Moreover, Tudor never designed or tested this proposed alternative design, not even for the purposes of his report. Nor did he determine

---

[7] In fact, Tudor acknowledged that Garlock sells asphalt kettles both with and without the ATECS feature. (DN 63-3, p. 137–38). He also testified that four out of six of Bruce's Tri–State's kettles were not equipped with ATECS units and that Basham arguably knew that the ATECS system was disconnected on the date of the incident. (*Id.*).

whether this proposed design would be both economically feasible and just as safe or safer than the kettle as designed by Garlock.[8]

For these reasons, we find that Tudor's testimony fails to satisfy the standard set forth in *Daubert* and must therefore be excluded. In sum, Tudor's lack of knowledge of the kettle's design and the roofing industry in general prevents him from testifying regarding any alleged design defect and the causal connection between the alleged defects and Basham's injuries. Moreover, Tudor's testimony does not support Plaintiff's theory of design defect because it does not raise a genuine issue as to whether an ordinarily prudent asphalt kettle manufacturer would have put the kettle in question on the market. In fact, Tudor testified that most asphalt kettle manufacturers produce kettles without any safety system features at all, thus essentially operating in the same manner as the Garlock kettle with the ATECS unit disengaged. (DN 63-5, p. 162–63).

Having excluded Plaintiff's sole expert, we find that Plaintiff has no evidence to support her contention that the asphalt kettle manufactured by Garlock was unreasonably dangerous, and therefore defective, or that the alleged defect caused the kettle to explode. *See Gray v. Gen. Motors Corp.*, 133 F. Supp. 2d 530, 533 (E.D. Ky. 2001) ("In products liability cases, the plaintiff must demonstrate that an identifiable defect probably caused the accident.") (citing *Midwestern V.W. Corp. v. Ringley*, 503 S.W.2d 745 (Ky. 1973)). Plaintiff has offered nothing more than a theoretical possibility that the kettle was defective because it allowed for the safety system to be bypassed. Yet Plaintiff does not dispute that the kettle operates in manual mode when the ATECS system is bypassed, and this is the way in which kettles are routinely manufactured and operated in the industry. Plaintiff has not produced evidence that an ordinarily

---

[8] When asked whether manufacturers in the roofing industry manufactured kettles with two externally mounted temperature gauges, Tudor replied that he did not know, but thought that Garlock's design was an attempt "at doing exactly that." (DN 63-5, p. 207).

prudent manufacturer of asphalt kettles, being fully aware of the risks of injury caused by the disabling of a safety system on the kettle, would not have put such a kettle on the market. *See Stewart v. Gen. Motors Corp.*, 102 F. App'x 961, 964 (6th Cir. 2004); *Montgomery Elevator*, 676 S.W.2d at 780 (citation omitted). Therefore, Garlock is entitled to summary judgment as to Counts I and II of the Amended Complaint.

**B.**

Plaintiff also brings a claim for failure to warn. Under Kentucky law, a manufacturer is required to warn the ultimate user of any dangers in its product. *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 783 (Ky. 1984). In this instance, Plaintiff alleges that Garlock had a duty to warn Basham that the kettle could overheat and potentially flash out tar. Plaintiff also avers that Garlock should have warned users about the potential harm that could arise if the ATECS system is bypassed.

Under Kentucky law, in order to survive summary judgment on a failure to warn claim, a plaintiff must provide evidence that: (1) the defendant had a duty to warn; (2) the warnings given by the defendant were inadequate; and (3) the inadequate warnings were the proximate cause of the plaintiff's injuries. *Stewart v. Gen. Motors Corp.*, 102 F. App'x 961, 964 (6th Cir. 2004) (citing *Morales v. American Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir.1995)). A warning is adequate if it affords the user, by the exercise of ordinary care on the user's part, fair and adequate notice of the possible consequences of use or misuse of the product. *Post v. Am. Cleaning Equip. Corp.*, 437 S.W.2d 516, 520 (Ky. 1969) (citation omitted). In Kentucky, the duty to warn "extends to the dangers likely to result from foreseeable misuse of a product." *Morales*, 71 F.3d at 537 (citations omitted). However, a warning is not required if the user is

aware of the product's danger. *Demaree v. Toyota Motor Corp.*, 37 F. Supp. 2d 959, 967 (W.D. Ky. 1999) (citing *Hutt v. Gibson Fiber Glass Prods., Inc.*, 914 F.2d 790, 793 (6th Cir.1990)).

As an initial matter, we find that Plaintiff's proposed expert testimony on the failure to warn claim is excluded for the reasons stated above. Exclusion is particularly appropriate in light of Tudor's testimony that he has never drafted a warning for an asphalt kettle's operator's manual and does not consider himself an expert in warnings. (DN 63-5, p. 75–77, 108–09).

Without the benefit of expert testimony on this issue, Plaintiff cannot meet her burden of producing evidence of the inadequacy of Garlock's warnings.[9] In the first instance, Plaintiff does not dispute Garlock's assertions that it posted warnings on the kettle itself and in the Operator's Manual. Moreover, she fails to identify how these warnings were inadequate as to Basham. Further, Plaintiff has not presented "proof linking the failure to warn causally with the injury." *Demaree*, 37 F. Supp. 2d at 968. Specifically, Plaintiff does not identify how Basham would have behaved differently had he been warned of the kettle's allegedly dangerous qualities. *See Stewart*, 102 F. App'x at 964–65.

In sum, Plaintiff has not come forward with any evidence regarding the alleged inadequacy of the warnings provided by Garlock. With the exclusion of Tudor's testimony, Plaintiff has not provided evidence of an alternative warning that Garlock should have included with the kettle. *See Demaree*, 37 F. Supp. 2d at 967. Thus, Plaintiff fails to raise a material issue of fact as to any allegedly inadequacies in the warnings accompanying the kettle. Accordingly, Garlock is entitled to summary judgment on Count III.

---

[9] Expert testimony may be necessary to prove causation on a failure to warn claim. *Compare Logan v. Cooper Tire & Rubber Co.*, 2011 WL 2471374 (E.D. Ky. June 21, 2011) (finding that expert testimony is necessary to establish that warnings on tires were inadequate, and that the inadequate warnings caused the plaintiff's injury because "[w]ithout such proof, the jury would be forced to speculate" as to these issues); *with Demaree*, 37 F. Supp. 2d at 969 n.10 (noting that "[s]ome courts have held that the need for a warning is a matter for expert testimony," but not finding that such requirement exists under Kentucky law).

## C.

Plaintiff also asserts a claim for breach of warranty under the Uniform Commercial Code. "Kentucky courts have interpreted the statutory language in Kentucky's enactment of the Uniform Commercial Code as requiring privity for breach of implied and express warranty actions." *Capps v. Bristol Bar & Grille, Inc.*, 2012 WL 1067908, *4 (W.D. Ky. Mar. 29, 2012) (citing *Williams v. Fulmer*, 695 S.W.2d 411 (Ky. 1985)).  This would include the claims alleged in the instant action for breach of the implied warranty of merchantability, KRS § 355.2-314, and the implied warranty of fitness for a particular purpose, KRS § 355.2-315.  Because Plaintiff does not provide evidence that Basham and Garlock were in privity of contract, her breach of warranty claims must fail.[10]  As Plaintiff does not otherwise refute Garlock's arguments regarding privity, summary judgment is proper on Count IV.

## IV.

For the reasons stated above, Garlock's motion for summary judgment (DN 63) is **GRANTED** as to all counts of the Amended Complaint.  A separate order and judgment will be entered in accordance with this Memorandum Opinion.

---

[10]  The privity requirement is contained in KRS § 355.2-318:

> A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty.  A seller may not exclude or limit the operation of this section.

Even if Basham was an intended user of the kettle, he does not share the "specified relationship with the buyer" that is required under the statute to create privity, as he and Garlock were not in a direct buyer–seller relationship.  *See Compex Int'l Co. v. Taylor*, 209 S.W.3d 462, 465 (Ky. 2006).